ANDREW W. BOYLE, PLAINTIFF-APPELLANT, v. COUNTY OF HUDSON, IMPLEADED AS BOARD OF CHOSEN FREEHOLDERS OF HUDSON COUNTY, DEFENDANT-RESPONDENT.

Argued November 26, 1951—Decided December 17, 1951.

*Mr. Louis J. Greenberg* argued the cause for appellant (*Mr. Samuel M. Cole*, attorney).

*Mr. Lewis B. Eastmead* argued the cause for respondent (*Mr. Daniel T. O'Regan*, attorney).

The opinion of the court was delivered by

CASE, J. The action was to recover for personal injuries suffered by plaintiff while a prisoner at the Hudson County Penitentiary. It was tried in the Hudson County Court where judgment was entered for defendant on its motion to dismiss at the close of plaintiff's case. The Appellate Division affirmed on appeal. The case was certified to us on plaintiff's motion.

Plaintiff, who had also served earlier terms of imprisonment at the institution and therefore had extended knowledge of its ways, was assigned to work at and about the barn. He took care of the horses of which there were three. He was familiar

with those particular horses and had driven them. In addition, he had had outside experience with horses and knew generally how to drive. At about 6:30 in the evening of July 10, 1948, the keeper under whose immediate supervision plaintiff was, told the latter to take the water wagon and sprinkle the road and to use whichever of the horses had not been exercised that day. Plaintiff designated the horse called "King." The keeper took the horse out of the barn and with plaintiff's help proceeded to harness and put it to the cart, with the horse facing in a direction away from the barn. The harnessing was done a few feet from the barn, indicated by a witness as the distance from one of the jurors to the desk in the court room. After harnessing the horse and fastening him to the cart the keeper proceeded to make his usual rounds. Plaintiff, seated in the driver's seat and holding the reins, undertook to turn the horse around to go past the barn, whereupon the horse made for the barn entrance. Plaintiff unsuccessfully pressed the foot brake, then jumped and was caught between the wagon and the barn structure and injured.

Appellant predicates his claim of liability upon the proposition that the county was guilty of active wrongdoing and rests upon *Milstrey v. City of Hackensack,* 6 *N. J.* 400 (1951), *Allas v. Rumson,* 115 *N. J. L.* 593 (*E. & A.* 1935), *Hammond v. County of Monmouth,* 117 *N. J. L.* 11 (*Sup. Ct.* 1936), and *Fisher v. Nutley,* 120 *N. J. L.* 290 (*E. & A.* 1938). It is not precisely stated what the alleged wrongdoing consisted of, but the facts permit nothing else than that it was either in the original acquisition of the horse, in the retention of it or in the direction to the plaintiff to drive it. The proofs do not sustain any of those implications.

The complaint charges that the cart had defective brakes and that the horse, to defendant's knowledge, was vicious. It is true that the witnesses apply the epithets "vicious," "wild" and "violent" to the horse, but the incidents in proof do not support those descriptions. There is no proof that the animal was vicious. It never harmed anyone. It made no attempt to bite or to kick at anyone. The horse was quick

in "taking off" on being given the rein. It was restive while being harnessed. Sometimes when it had the chance it left the barn, ran for a short distance and then whirled around. One of the witnesses testified that he was employed as driver of the laundry wagon, that he drove the horse "for about four months straight" and "off and on" for a year and that the horse "took off" a few times and the witness had made a "kick" against driving him; but the fact, when arrived at, was that the horse, if left unattended, had a way of going off but had never done so in the witness' experience when someone was at the reins; and, further, that the only trouble the horse caused was while he was being "hooked up," but that even then the witness did the job by himself without help and that "after I gave him a run he was all right." One witness related that while he was out with a fellow prisoner who was doing the driving the horse undertook to run but that the driver after "a little trouble" "handled" him. Plaintiff, knowing the qualities of the animal, did not hesitate to drive him when so directed. He made not the least remonstrance when ordered to his task and did not remark upon any undesirable qualities of the animal. He had never informed the keeper that the horse in fact or in his belief was bad. He reiterated in his testimony that the keeper "knew" the horse was "vicious," and when the witness was asked by his attorney to give his reason for that statement he replied:

"Because every time I went out there to feed him in the night time when he (viz., the keeper) was on he would come in the barn with me, he would get one side and I would get the other and the horse would go over to the water and take his drink. Then I would feed him and then he would hold him outside and I would feed him and I would put all the hay down in the stall and he would lock up the barn and take me back to the jail again."

We find no basis in that or any other testimony for finding that the immediate keepers of the prisoners, much less the superiors or the defendant, had knowledge that the animal was, in any unusual degree, dangerous to drive.

It is also charged that the cart was known to be defective, and reliance for that charge is placed upon the proof that in the dash made over the few feet between the place where the horse was harnessed to the cart and the point where plaintiff jumped the cart was not stopped by the plaintiff's foot pressure upon the brake. It is clear that the sufficiency of a foot brake upon a cart wheel is not fairly tested by an instant's pressure against the pull of a running horse. The proof does not meet the burden of proving a faulty mechanism. It certainly does not prove such knowledge by the defendant as would subject it to liability under the facts of the case.

The County of Hudson in operating, through its board of chosen freeholders, the county penitentiary was discharging a governmental duty. That operation did not relieve it from responsibility for active wrongdoing as established in the cases cited *supra*, and it does not, as respondent appears to argue, relieve it from all obligation to prisoners. The facts upon which we are adjudicating do not require an analysis of the extent of the duty of the governing body to its lawfully incarcerated prisoners and do not warrant an amplification or application of the doctrine of active wrongdoing beyond what is already in our books. To constitute active wrongdoing there must be a positive transgression against duty. No such act has been proved against the defendant. The burden of supplying that proof is upon the plaintiff, and he has not carried the burden.

The judgment below will be affirmed, with costs.

*For affirmance*—Justices CASE, HEHER, OLIPHANT, WACHENFELD and BURLING—5.

*For reversal*—Chief Justice VANDERBILT and Justice ACKERSON—2.